THE STATE OF FLORIDA *ex rel.* RIVERS H. BUFORD, AS AT-TORNEY GENERAL, *Appellant,* v. CITY OF TAMPA AND D. P. DAVIS, *Appellees.*

En Banc.

Opinion Filed September 9, 1924.

Petition for Rehearing Denied November 5, 1924.

1. The title to marsh lands, subject to tidal overflow and the shoal waters of bays and inland waterways, is in the State, by reason of her sovereignty, and under her control subject to the control of the United States Government for purposes of navigation.

2. There is no provision in the Constitution of this State expressly or impliedly forbidding the Legislature to dispose of submerged lands lying between high and low water mark, nor declaring any trust in the State in its tide waters, nor the submerged lands that may be subject to overflow at high tide. Whatever trust exists is that of the common law, which the State, through its Legislature, assumed and the State accepted with reference to such lands when it was admitted to the Union.

3. In so far as the trust in the State affects the right of navigation, it was completely taken over by the National Government under the Commerce Clause of the Federal Constitution. Beyond that the control rests with the State and the riparian owner.

4. Lands that do not immediately border on navigable waters, but which are covered by water not capable of navigation for useful public purposes, such as mud flats, shallow inlets and low lands covered more or less by water permanently, or at intervals, where the tide ebbs and flows, and the waters thereon are not in their ordinary state useful for public navigation, are held by the State for the use and benefit of the public for boating, fishing and swimming, but

the State may part with the title to same by Act of the Legislature.

5. Chapter 4882, Laws of 1899, which granted to the City of Tampa, in fee simple absolute, all lands owned or held by the State of Florida, in trust or otherwise, and lying and being within the corporate limits of the city, whether said lands are covered, or partly covered by the tide, or other waters, including all sawgrass and marsh lands, as well as the bottom of Hillsborough Bay and Hillsborough River, constitutes sufficient authority to the City of Tampa to enable it to enter into a contract for the reclamation and development for residential purposes of certain lands embracing Grassy Island and Depot Key and certain lands adjacent which are partially covered by the waters of Hillsborough Bay and consist of mud flats having no value for purposes of commerce or navigation.

6. Chapter 8537, Acts of 1921, divesting the State of all right, title and interest to all lands covered by water lying in front of any tract of land owned by the United States or by any person, natural or artificial, or by any municipality, county or governmental corporation under the laws of Florida, lying upon navigable streams or bays of the sea as far as the edge of the channel and giving to such riparian proprietors the right to build wharves into streams or waters of the bay or harbor as far as may be necessary to effect the purposes described, and to fill up from the shore as far as may be desired, not obstructing the channel, and upon lands so filled in to erect improvements consisting of buildings, dwellings and warehouses, etc., is not obnoxious to the Constitution.

WHITFIELD and TERRELL, J. J., Dissent.

An appeal from the Circuit Court for Hillsborough County, F. M. Robles, Judge.

Decree affirmed.

*Rivers Buford,* Attorney General, and *J. B. Johnson,* for Appellant;

*Mabry, Reaves & Carlton, James F. Glen* and *Hilton S. Hampton,* for Appellees.

ELLIS, J.—The Legislature, by Chapter 4883, Laws of 1899, so amended the city charter of the City of Tampa that the Southern boundary line of said city was described by a line extending from a point in Tampa Bay where the section lines between Sections 29 and 30 and 29 and 32 in Township 29 South, Range 19 East if extended into the Bay would intersect, to the Southwest corner of Section 36 in Township 29 South, Range 18 East. The Western boundary line, under said act, extends due North from the Southwest corner of Section 36 to the Northwest corner of Section 13 in said Township and Range.

The Legislature, by Chapter 4882 Laws of 1899, approved June 1st of that year, two days after the approval of Chapter 4883, undertook to grant to the City of Tampa, in fee simple absolute, "all lands owned or held by the State of Florida, in trust or otherwise, and lying and being within the corporate limits of said City of Tampa, whether said lands are covered, or partly covered by the tide, or other waters, and including all sawgrass and marsh lands, as well as the bottom of Hillsborough Bay and Hillsborough River."

The second Section of this Act is as follows: "Sec. 2. That this Act shall be held and construed to be a public act, and all laws and parts of laws in conflict with its provisions be and the same are hereby repealed."

The southern boundary line of the City of Tampa, as above described, lies wholly in Hillsborough Bay, a navigable body of water; and a large area lying north of that

line, with the exception of two small islands, namely: Grassy Island and Depot Key, is submerged lands and constitutes part of the bottom of Hillsborough Bay. A part of the Government Ship Canal which extends from a point on the South boundary line into Section twenty-four, Township twenty-nine South, Range eighteen East, lies within the city limits as described by Chapter 4883, *supra*.

In 1913, by Chapter 6781, the Legislature granted to the City of Tampa, "certain lands and middle ground and over-flowed lands in the Hillsborough River and in Sparkman Bay and in Hillsborough Bay in Hillsborough County" for a period of one thousand years for the purpose of commerce, navigation and municipal docks and terminals for such purposes. It was provided that the improvements of docks and terminals on such lands, or any part thereof, be made within twenty-five years. The city was granted the right to widen, extend or deepen the channel of the Hillsborough River and Sparkman Bay and Hillsborough Bay, and to "fill in, build up, have, possess, use and own shoals, shallows and middle ground or flats and all overflow lands therein." It was also provided that the "rights and privileges of navigation now vested in owners of lands abutting on said submerged lands heretofore granted or acquired shall not be impaired."

The Act described the "certain lands and middle ground and over-flowed lands" by metes and bounds and such lines embrace all the lands and bottoms of Hillsborough Bay and lands covered by the tide, or other waters, granted to the city in 1899 by Chapter 4882, *supra*.

In 1921, by Chapter 9095, the Legislature validated an election held in the City of Tampa in 1920 under the provisions of the Act of 1915, Chapter 6940, entitled "An

Act Authorizing Cities and Towns To Amend Their Charters and To Adopt Charters for Their Government." By that Act, Chapter 9095, the government of the city was changed to the Commission form of government.

There were other acts of the Legislature enacted since 1899 dealing with the powers and properties of the City of Tampa.

In 1917, by Chapter 7304, the Legislature enacted that "The title to all islands, sand bars, shallow banks or small islands made by the process of dredging of the channel by the United States Government located in the tidal waters of the counties in the State of Florida, or similar, of other islands, sand bars and shallow banks upon which the water is not more than three feet deep at high tide and which are separated from the shore by a channel or channels, not less than five feet deep at high tide, or sand bars and shallow banks along the shores of the mainland in which the title is not, at this date, invested in prior parties, is hereby invested in the Trustees of the Internal Improvement Fund of the State of Florida, to be held by the State of Florida, and disposed of as hereinafter provided."

Section Two of the Act provided that the Trustees should have the power to sell and convey the islands and submerged lands granted upon such prices and terms as they shall see fit after notice given by publication in a newspaper published in the County Seat of the County in which such lands, or submerged lands are located.

Section Six repealed all laws and parts of laws in conflict with the Act.

In 1921 the Legislature enacted a law entitled "An Act Granting and Confirming Riparian Rights and Submerged and Filled-in Lands." The Chapter is numbered 8537. Section One provides:

"Whereas, It is for the benefit of the State of Florida that water front property be improved and developed; and,

"Whereas, the State being the proprietor of all submerged lands and water privileges within its boundaries, which prevents the riparian owners from improving their water lots; therefore,

"The State of Florida, for the consideration above mentioned subject to any inaleinable trust under which the State holds said lands, divests itself of all right, title and interest to all lands covered by water lying in front of any tract of land owned by the United State or by any person, natural or artificial, or by any municipality, county or governmental corporation under the laws of Florida, lying upon any navigable stream or bay of the sea or harbor, as far as to the edge of the channel, and hereby vests the full title to the same, subject to said trust in and to the riparian proprietors, giving them the full right and privilege to build wharves into streams or waters of the bay or harbor as far as may be necessary to affect the purposes described, and to fill up from the shore, bank or beach as far as may be desired, not obstructing the channel, but leaving full space for the requirements of commerce, and upon lands so filled in to erect warehouses, dwellings or other buildings and also the right to prevent encroachments of any other person upon all such submerged land in the direction of their lines continued to the channel by bill in chancery or at law, and to have and maintain action of trespass in any court of competent jurisdiction in the State, for any interference with such property, also confirming to the riparian proprietors all improvements which may have heretofore been made upon submerged lands.

"Provided, that the grant herein made shall apply to and affect only those submerged lands which have been,

or may be hereinafter actually bulk-headed or filled in or permanently improved continuously from high water mark in the direction of the channel, or as near in the direction of the channel as practicable to equitably distribute the submerged lands, and shall in no wise affect such submerged lands until actually filled in or permanently improved.''

The Act was made retroactive so as to take effect from December 27, 1856, and was intended to enlarge the Act of that year entitled ''An Act to Benefit Commerce'' which was construed in the case of Thiesen v. Gulf F. & A. R. Co., 75 Fla. 28, 78 South. Rep. 491.

In that case this court said: ''At common law lands which were bounded by and extended to the high water mark of waters in which the tide ebbed and flowed were riparian or littoral to such waters. * * * * * And applying the common law doctrine to the subject in this State the title to the soil under such waters to the high water mark is in the State of Florida subject to the powers of Congress to regulate commerce. * * * * The title however is held in trust for the people who have the rights of navigating, fishing, bathing and commerce upon and in the waters.''

Quoting from Hale's Treatise DeJure Maris, by Hargrave, this court said: ''the ground between ordinary high water mark and low water mark is owned by the sovereign but not for his exclusive use and profit, but in trust for the common benefit of all his subjects. Any intrusion by the owner of the upland upon the shore between high and low water mark was unlawful and was treated either as a purpresture or a nuisance.''

Referring to the conditions existing in this State this court quoting from Angell an Tide Waters said: '' 'It is well known that in the respective States which lie along

VOL. 88, JUNE TERM, 1924.          203

State ex rel. Buford v. City of Tampa et al.—Opinion of Court.

the margin of the Atlantic there are many places where the tide ebbs and flows', and which therefore are public, 'that are of no navigable use and in their original condition without the aid of art and industry afford to the public little or no advantage of any kind.' Flats and marshes covered with water only at full tide. In many cases such waste places have been built up, docks or piers run over them to navigable water by the riparian proprietor and the public have been thereby very considerably the gainers. But that condition in no wise affects the common law, but is one which commends itself to the Legislatures of the respective states for the adoption of such regulations as may be deemed to be for the best interests of the people.''

This language is just as applicable to such places as lie along the margin of the Gulf of Mexico and to shoal tide waters where the depth averages from three inches to three or four feet and which lie near to, or within, the limits of municipal corporations, the centers of industry and commerce.

This decision was rendered in 1918 and in 1921 the Legislature declared in Chapter 8537, *supra*, that ''It is for the benefit of the State of Florida that water front property be improved and developed.''

This rather lengthy preliminary statement is made that it may be more clearly understood what the conditions were and what the Legislative purpose seemed to be regarding the State's control of marsh lands subject to tidal overflow and the shoal waters of bays and inland waterways which may, by the aid of art and industry, be utilized and rendered advantageous to the public, subject always, of course, to the control of the United States Government for purposes of navigation, when the subject of this litigation arose.

In February, 1924, the City of Tampa entered into a contract with D. P. Davis to sell and convey to him all the city's right, title and interest in and to all that portion of the city's property conveyed to it by the Act of 1899, Chapter 4882 lying in Sections 24, 25 and 36 in Township 29 South, Range 18 East, and Section 31 in Township 29, Range 19 East, lying west of the Government Channel and Turning Basin West of Seddon Island in the harbor of Tampa and North of a line drawn from the Southwest corner of said Section 36 in a Northeasterly direction in a straight line to the Northeast corner of said Section 31, and East of a line beginning at a point on the South boundary line of said Section 36, 2253 feet East of the Southwest corner of said Section; run thence North two degrees forty five minutes west to a point on the North boundary of Section 36, 2000 feet East of the Northwest corner of said Section 36; thence in a Northeasterly direction to a point on the North boundary line of said Section 25, 2655 feet East of the Northwest corner of said Section 25 and South of the Old River Channel and Turning Basin North of Grassy Island. No part of said development on the North to be nearer the mainland than 700 feet.

There is an error in the description of the Southern boundary line of the City of Tampa, as it appears in the printed statutes of 1911 and 1913, to which reference has been made. Section 36 is described as being in Range 19 instead of Range 18.

The contract provided, among other things, that Davis should pay two hundred thousand dollars to the city as the purchase price of the property within four years, or within that time to convey to the city a bridge to be built by Davis and to be constructed of certain materials and according to certain specifications, and certain parks to

be built upon the property and described in the convey-
ance. The agreement stated that the purpose of the trans-
action was to develop the property into a "high-class
residential subdivision" and as part of the development
a bridge, fully described, and parks were to be built and
conveyed to the city in payment of the purchase price.
The development of the property to be conveyed to Davis
is to be accomplished by constructing a concrete wall or
bulkhead along the entire Westerly line of sufficient
strength and height to support a fill of said premises to
a height of not less than seven feet above mean low tide
and suitable provisions made for yacht basins and
drainage.

The Attorney General in the name of the State of
Florida exhibited his bill in the Circuit Court for Hills-
borough County against the City of Tampa and D. P.
Davis to declare the contract void and that the defendants
be enjoined from proceeding to carry out and execute the
same.

The defendants answered averring, among other things,
that the contract had been ratified by the qualified voters
of Tampa; the power of the city to enter into it; that
Davis had acquired by purchase from the owners all that
portion of Depot Key lying within the territory embraced
in the contract which lies in Section 25, and the city is
the owner by purchase of that part of the island lying in
Section 36, and Grassy Island constitutes part of a Govern-
ment lot surveyed by the United States Government as
land; that that part of the property which takes in terri-
tory to the North and West of Grassy Island, and West,
South and East of Depot Key, and the territory interven-
ing is practically in its entirety land created by the oper-
ation of the United States Government in digging and
from time to time dredging the Government Channel and

has long since ceased to be a part of the waters of Hillsborough Bay; that on approximately one-half of the area embraced in the contract the depth of the water runs from four inches to a maximum depth of five and four tenths feet and a greater portion of the area has a less depth than two feet. And the said area consists as a whole of mud flats which almost in their entirety are uncovered by water at very low tide; that said premises have no value for purposes of commerce or navigation and that the filling in of the lands as contemplated by the contract by dredging will, in reality, improve the navigability of Hillsborough Bay and will add to the wealth of the city by removing the mud flats which are uncovered at low tide.

It is also averred that the area embraced in the contract in its present condition is valueless for any purpose and the improvement as contemplated will ultimately add to the taxable value of property in the City of Tampa by several millions of dollars, and that the contract is in the public interest of Tampa and the State of Florida. That in so far as the contract embraces lands not submerged the defendant, Davis, has acquired by purchase from the owners thereof the title to said property with all such rights as may be accorded to him under the laws of Florida as a riparian owner to fill in to the Channel, and no part of the premises embraced in the contract constitutes any part of the Channel of Hillsborough Bay and all the filling proposed to be done is such as the said Davis, as riparian owner, is authorized to do under the laws of Florida. The answer concludes with a prayer that the contract be declared to be valid and within the power of the City of Tampa to make and that the defendant Davis upon the delivery to him of a deed of conveyance to the premises be quieted in his title.

The cause was heard upon bill and answer. The Chancellor decreed that the contract was valid, was within the power of the City of Tampa to enter into, that the equities were with the defendant and the bill of complainant was dismissed.

The Attorney General took an appeal and the decree is here for review.

It is contended in behalf of the appellant that Chapter 4882 Acts of 1899 and Chapter 6781 Acts of 1913, under which the City of Tampa claims the right to enter into the contract with the defendant Davis, are ineffectual to vest such right and are void in so far, at least, as they constitute an attempt to dispose of the State's title to the submerged lands within the area sought to be conveyed, because the Legislature has no power to dispose of such lands and divest itself of the title thereto which it holds in its sovereign capacity for the benefit of the people for navigation, boating or fishing.

There is no provision in the Constitution of this State expressly or impliedly forbidding the Legislature to dispose of submerged lands lying between high and low water mark, nor declaring any trust in the State in its tide waters, nor the submerged lands that may be subject to overflow at high tide. Whatever trust was imposed was that of the common law which the State through its Legislature assumed, and the State accepted with reference to such lands, when it was admitted to the Union.

That portion of the trust, in so far as it affects the right of navigation, was completely taken over by the National Government under the Commerce Clause of the Constitution. Beyond that the control rests with the State and the riparian owner. See United States v. Chandler-Dunbar Water Power Co., 229 U. S. 53, 57 L. Ed. 1063, 33 Sup. Ct. Rep. 667.

This doctrine is so well settled that it is unnecessary to do more than state it.

That would seem to eliminate the question of whether the waters involved in this controversy are navigable in so far, at least, as the State's objection to the proposed use of the property may be based upon that consideration, because if the project interferes with the navigation of the Bay the National Government may interfere.

In Clement v. Watson, 63 Fla. 109, 58 South. Rep. 25, this court said that the shore of navigable waters which the sovereign holds for public uses is the land which borders on navigable waters and lies between ordinary high and ordinary low water mark. This does not include lands that do not immediately border on the navigable waters and that are covered by water not capable of navigation for useful public purposes, such as mud flats, shallow inlets and low lands covered more or less by water permanently or at intervals, where the waters thereon are not in their ordinary state useful for public navigation. Lands not covered by navigable waters and not included in the shore space between ordinary high and low water marks immediately bordering on navigable waters are the subject of private ownership, at least when the public rights of navigation are not thereby unlawfully impaired. That, while the lands under navigable waters including the shore space between high and low water marks are held by the State for the purposes of navigation and other public uses, subject to lawful governmental regulation, the rule is applicable only to such waters as are in fact capable of navigation for useful public purposes.

The answer avers that the waters embraced within the area contracted to be sold are not within this latter class; and that averment is taken as true.

But the waters embraced within the area are tidal waters

although not navigable according to the averments of the answer. The right of property in such waters and in the soil is in the State. Thiesen v. Gulf, F. & A. R. Co., *supra*.

That case recognized the doctrine that such waters and lands were held by the State for the use and benefit of the public for boating, fishing and swimming, but also recognized the well established doctrine that the State might part with such title through acts of the Legislature by recognizing the Act of 1856 entitled "An Act to benefit Commerce" and holding that the grant was limited to lands which were actually bounded by and extended to low water mark; and by referring to the conditions existing in this State affecting flats, marshes and places where the tide ebbs and flows, which under the common law was held by the State for the benefit of the general public, and by saying that such lands and places presented a situation which commended itself to the Legislature for the adoption of such regulations as it may deem to be for the best interests of the people.

This court has never held that the State could not by act of the Legislature divest itself of the title to such lands and counsel's criticism to the contrary, did not so hold in Broward v. Mabry, 58 Fla. 398, 50 South. Rep. 826. The court in that case said: "The trust in which the title to the lands under navigable waters is held is governmental in its nature and cannot be wholly alienated by the States." See 1 Farnham Waters and Water Rights, p. p. 51-212. See also a discussion of the subject in a note to Linthicum v. Shipley, 140 Md. 96, 116 Atl. Rep. 871, also reported in 23 A. L. R. 754, note page 764.

The Legislature, by Chapter 4882, Acts 1899, granted to the City of Tampa the lands embraced in the area described in the contract to which the State held the title.

The Act of 1915, in so far as it was an attempt to limit the grant of 1899, was ineffectual.

The policy of the State, as declared by the Act of 1921, Chapter 8537, *supra,* is declared to be that it is for the State's benefit that water front property be improved and benefitted. The Act provided that subject to any inalienable trust under which it holds any such lands it divests itself of all right, title and interest to all lands covered by water lying in front of any tract of land owned by the United States or by any person, natural or artificial, or by any municipality, county or governmental corporation under the Laws of Florida lying upon any navigable stream or bay of the sea or harbor as far as to the edge of the channel and hereby vests the full title to the same subject to said trust in and to the riparian proprietors, giving them "the full right and privilege to build wharves into streams or waters of the bay or harbor as far as may be necessary to affect the purposes described, and to fill up from the shore, bank or beach as far as may be desired, not obstructing the channel, but leaving full space for the requirements of commerce, and upon lands so filled in to erect warehouses, dwellings or other buildings and also the right to prevent enroachments of any other person upon all such submerged land in the direction of their lines continued to the channel by bill in chancery or at law, and to have and maintain action of trespass in any court of competent jurisdiction in the State, for any interference with such property, also confirming to the riparian proprietors all improvements which may have heretofore been made upon submerged lands."

We discover no constitutional objection to that Act nor has any been urged. Indeed it is within the power of the Legislature so to dispose of such lands without any express constitutional authorization therefor. The statute is ap-

plicable in this case to the owners of the two islands, who may, acting under its provisions and within its scope, bulkhead the area and fill in the same within appropriate limits as riparian owners.

In this view of the law of the subject our conclusion is that the decree shall be, and is hereby affirmed.

TAYLOR, C. J., AND BROWNE AND WEST, J. J., concur.

WHITFIELD AND TERRELL, J. J., dissent.

WHITFIELD, J., dissenting.

This suit concerns tide land and land under navigable waters, called sovereignty lands, to distinguish them from ordinary public lands, the nature and uses of the two classes being materially different.

"Lands under tide waters are incapable of cultivation or improvement in the manner of lands above high water mark. They are of great value to the public for the purposes of commerce, navigation and fishery. Their improvement by individuals, when permitted, is incidental or subordinate to the public use and right. Therefore the title and the control of them are vested in the sovereign for the benefit of the whole people.

"At common law, the title and the dominion in lands flowed by the tide were in the King for the benefit of the nation. Upon the settlement of the colonies, like rights passed to the grantees in the royal charters, in trust for the communities to be established. Upon the American Revolution, these rights, charged with a like trust, were vested in the original States within their respective borders, subject to the rights surrendered by the Constitution to the United States.

"Upon the acquisition of a territory by the United

States, whether by cession from one of the States, or by treaty with a foreign country, or by discovery and settlement, the same title and dominion passed to the United States, for the benefit of the whole people, and in trust for the several States to be ultimately created out of the territory.

"The new States admitted into the Union since the adoption of the Constitution have the same rights as the original States in the tide waters, and in the lands under them, within their respective jurisdictions. The title and rights of riparian or littoral proprietors in the soil below high water mark, therefore, are governed by the laws of the several States, subject to the rights granted to the United States by the Constitution.

"The United States, while they hold the country as a Territory, having all the powers both of national and of municipal government, may grant, for appropriate purposes, titles or rights in the soil below high water mark of tide waters. But they have never done so by general laws; and, unless in some cases of international duty or public exigency, have acted upon the policy, as most in accordance with the interest of the people and with the object for which the territories were acquired, of leaving the administration and disposition of the sovereign rights in navigable waters, and in the soil under them, to the control of the States, respectively, when organized and admitted into the Union."

Shively v. Bowlby, 152 U. S. 1, text 57. As to tide lands, see Mann v. Tacoma Land Co., 153 U.S. 273, 14 Sup. Ct. Rep. 820; Baer v. Moran Bros. Co., 153 U. S. 287, 14 Sup. Ct. Rep. 823. See also Port of Seattle v. Oregon & W. R. Co., 255 U. S. 56, 41 Sup. Ct. Rep. 237; 38 Cyc. 303; City and county of San Francisco v. LeRoy, 138 U. S. 656, 11 Sup. Ct. Rep. 364; State ex rel. Board of Com'rs. of

Atchafalaya Basin Levee Dist. v. Capdeville, 146 La. 94, 83 South. Rep. 421; Mobile Transp. Co. v. Mobile, 187 U. S. 479, 23 Sup. Ct. Rep. 170; 27 R. C. L. 1324, 3 How (U. S.) 212; 18 Wallace 57.

"Lands underlying navigable waters within the several States belong to the respective States in virtue of their sovereignty and may be used and disposed of as they may direct, subject always to the rights of the public in such waters and to the paramount power of Congress to control their navigation so far as may be necessary for the regulation of commerce among the States and with foreign nations." Scott v. Tattig, 227 U. S. 229, text 242, 33 Sup. Ct. Rep. 242. See McQuillan Munic. Cor. Sec. 398.

By treaty dated February 22, 1819, the Kingdom of Spain ceded "to the United States in full property and sovereignty, all the territories" then belonging to Spain, "known by the name of East and West Florida," which cession included all tide lands and lands covered by navigable waters within the territories ceded, except those, if any, that were lawfully granted by Spain to individuals prior to January 24, 1818. See Articles II and VIII, Treaty of Cession. Pursuant to the policy of the government of the United States, such tide and submerged lands were held by the United States for the benefit of the future State and the whole of its people. 152 U. S. 1.

In the absence of contrary provisions of controlling law, when Florida was "admitted into the Union on equal footing with the original States, in all respects whatsoever" by an Act of Congress, approved March 3, 1845, the State by virtue of its sovereignty, assumed the title to all tide lands and all lands covered by navigable waters within the State, that were theretofore held by the United States, such lands to be held by the State not for the ordinary purpose of conversion into private ownership, but the title thereto is

subject to the lawful use of the navigable waters by all the people of the State; and as an incident to the authorized public use of the waters for navigation, fishing, etc., the title is subject to the public use of the tide and submerged lands in so far as they may be needed in appropriately using the navigable waters, the public uses of the waters and the lands being subject to lawful regulation by the State in the interest of the whole people, and all being subject to the dominant power of Congress to regulate navigation and commerce. There are public rights of access to and uses of navigable waters, that may not be included in the authority actually exercised by Congress, and these rights should be conserved by the State for its people. See Lee v. State of New Jersey, 207 U. S. 67, 28 Sup. Ct. Rep. 22; 27 R. C. L. 1325; 223 U. S. 166, 70 Fla. 363; 442.

Tide lands are those that are daily covered and uncovered by the ordinary ebb and flow of normal tides. Tide lands and lands covered by all navigable waters in a State are called sovereignty lands as distinguished from ordinary public lands, the latter being subject to sale and private ownership in fee simple absolute, while the former have limitations of tenure and uses for public purposes.

In Florida tide lands are relatively very great in extent. They vary materially in location, character and usefulness. Perhaps the greater part of the tide lands in the State are not needed to effectuate the authorized public uses of the navigable waters within the State. Many of such tide lands have immense potential value for purposes of reclammation and improvement. It conserves the best interests of the State and of all its people to have the potential values of tide lands within the State developed and utilized for residential, commercial, business and other useful purposes, when it can be done without substantially or materially impairing the lawful public uses of the navigable waters in the

State. This has been the policy of the State as evidenced by the riparian acts of 1856 and 1921, and by other statutes authorizing, in the interest of the whole people of the State, the reclamation and improvement of tide and submerged lands for public and private purposes when the authorized public uses of the navigable waters in the State are not thereby jeopardized or materially impaired or interfered with.

"The navigable waters of the State and the soil beneath them, including the shore or space between high and low water marks, are the property of the State, or of the people of the State in their united or sovereign capacity, and are held not for the purposes of sale or conversion into other values, or reduction into several individual ownership, but for the use and enjoyment of the same by all the people of the State, for, at least, the purposes of navigation and fishing, and other implied purposes; and the law-making branch of the government of the State considered as the fiduciary or representative of the people, are, when dealing with such lands and waters, limited in their powers by the real nature and purposes of the tenure of the same, and must be held to have acted with a due regard for the preservation of such lands and waters to the uses for which they were held." State v. Black River Phosphate Co., 32 Fla. 82, text 106, 13 South. Rep. 640. The riparian Act of 1921 makes its grants of submerged lands "subject to any inalienable trust under which the State holds said lands." Sec. 1, Chap. 8537.

The title of the State to tide lands and lands under navigable waters is subject to such public uses as are allowed by law in the navigable waters; and all grants and conveyances of such lands should be interpreted with reference to the nature of the uses to which the title of the State may by law be subject. The rights of the public in the

navigable waters, whether of navigation, fishing or otherwise, are subject to regulation by the State to conserve the general welfare of the whole people of the State. But the title and regulating authority of the State and the rights of the public are subordinate to the paramount powers of the Congress over all public navigable waters in the State. See Gibbons v. Ogden, 9 Wheat. (U. S.) 1; Lewis Blue Point Oyster Cultivation Co. v. Briggs, 229 U. S. 82, 33 Sup. Ct. Rep. 679; 70 Fla. 363.

For the purpose of enhancing the rights and interests of the whole people, the States may by appropriate means grant to individuals the title to limited portions of the lands under navigable waters, or may give limited privileges therein, but not so as to divert them from their proper uses for the public welfare, or so as to relieve the States respectively of the control and regulation of the uses afforded by the land and the waters, or so as to interfere with the lawful authority of Congress. State ex rel. Ellis v. Gerbing, 56 Fla. 603, 47 South. Rep. 353, 22 L. R. A. (N. S.) 337; Broward v. Mabry, 58 Fla. 398, text 408, 50 South. Rep. 826; Brickell v. Trammell, 77 Fla. 544, 82 South. Rep. 221; Clement v. Watson, 63 Fla. 109, 58 South. Rep. 25; Chicago v. Illinois Cent. R. Co., 146 U. S. 397, 13 Sup. Ct. Rep. 110; Illinois v. Illinois Cent. R. Co., 184 U. S. 77, 22 Sup. Ct. Rep. 300. See also Ward v. Mulford, 32 Cal. 365; 27 R. C. L. 1329; People v. New York and Staten Island Ferry Co., 68 N. Y. 71; Long Sault Development Co. v. Kennedy, 212 N. Y. 1, 105 N. E. Rep. 849, Ann. Cas. 1915D 56; 29 Cyc. 357; James River & Kanawha Power Co. v. Old Dominion Iron & Steel Corp., —Va—,122 S. E. Rep. 344.

Subject to the power of Congress as to navigable waters, such portions of the tide and submerged lands as are not reasonably needed to effectuate the authorized public uses

of the navigable waters, may, by or pursuant to duly enacted statutes, predicated upon existing facts, to conserve the interest of all the people of the State, and for appropriate considerations, be granted or conveyed to private ownership discharged of the public uses, if the private use of the lands does not substantially impair the authorized public uses of the navigable waters; and to this end reasonably adequate access by the public to the adjacent navigable waters from or over the granted lands should be duly provided for, particularly where the granted lands are to be used for residential, business or reclamation and commercial purposes or where the granted lands separate the navigable waters from other lands used for residential, commercial or business purposes, or where the public welfare reasonably may require access by the public to the navigable waters from or over the granted lands. The grant of submerged lands to a railroad company contained in Section 6, Chapter 5595, Acts of 1905, is restrictive in its terms, and is for a quasi-public purpose.  See also State v. Black River Phosphate Co., 32 Fla. 32, 13 South. Rep. 640.

Grants or conveyances of title to tide lands and lands under navigable waters called sovereignty lands should be made by or pursuant to definitely worded statutes duly enacted for appropriate purposes and considerations; and such statutes, grants and conveyances should be construed and applied with reference to the nature of the State's title and with due regard for the rights of the whole people of the State in permissible uses of the navigable waters, to the end that such public rights may be appropriately and fully conserved, both in access to and in lawful uses of the navigable waters and the lands thereunder.

If it be assumed that a duly enacted statute may, by vesting title in a city or otherwise, authorize the city to

grant in fee simple title, to an individual for private development and sale as a residential subdivision, a large body of tide lands and a considerable portion of the bed of a navigable river and bay adjacent to the city, aggregating "approximately six hundred acres," the lands to be filled in to main navigable waters, and without provision for access by the public to the navigable waters from the lands granted, no such statute is shown in this case.

Municipalities are legal entities for local governmental purposes, and they can exercise only such authority as is conferred by express or implied provisions of law. The existence of authority to act cannot be assumed, but it should be made to appear. If reasonable doubt exists as to a particular power of a municipality it should be resolved against the city. Malone v. City of Quincy, 66 Fla. 52, 62 South. Rep. 922. See Florida Cent. & P. R. Co. v. Ocala St. & S. R. Co., 39 Fla. 306, 22 South, Rep. 692; 1 Dillon on Municipal Corporations (5th ed.) §237.

Where the State transfers the title to lands under navigable waters, the grantee takes the title subject to the rights of the public in the navigable waters. Broward v. Mabry, 58 Fla. 398, text 410, 50 South. Rep. 826. This is the legal effect of a grant or conveyance of such title even though not stated in the instrument, and results from the nature of the State's title and the primary rights of the public in the navigable waters.

Where lands under navigable waters are granted to a municipality, it is usually done for appropriate public purposes; and the city when duly authorized to do so can convey only such title as the State could transfer. The city, a governmental agency with only granted powers, can make such a conveyance only when and as authorized by a duly enacted statute. See 1 Dillon on Munic. Corp. (5th ed.) §270. See also 28 Cyc. 621.

VOL. 88, JUNE TERM, 1924.        219

State ex rel. Buford v. City of Tampa et al.—Dissenting Opinion.

Chapter 4882, Acts of 1899; under a' title expressing a purpose to "grant to the City of Tampa, all lands belonging to the State of Florida, and lying in the corporate limits of the city," purports to grant *to the city "in fee simple absolute,"* without any descriptions whatever, "all lands *owned or held* by the State of Florida, *in trust or otherwise,"* and lying within said city, including tide lands "as well as the bottom of Hillsborough Bay and Hillsborough River." The title does not express the real "subject" of the Act, and the grant is not within the scope of the title which is misleading with reference to the contents of the Act, thereby violating Section 16, Article III of the Constitution. Savannah, F. & W. Ry. Co. v. Geiger, 21 Fla. 669; Webster v. Powell, 36 Fla. 703. See also Mobile Dry-Docks Co. v. City of Mobile, 146 Ala. 198, 40 South. Rep. 205; 9 Ann. Cas. 1229, 3 L. R. A. (N. S.) 822; Cox v. State, 144 N. Y. 396, 39 N. E. Rep. 400.

There is nothing in the title of Chapter 4882 to show that the Act, without describing any lands, purported to grant "in fee simple absolute" to the city as stated in the Attorney General's brief, "approximately 2,000 acres of sovereignty lands, including the ship-channels, turning basins and Hillsborough Bay and Hillsborough River," within the city limits.

The title of Chapter 4882 does not indicate a purpose to grant sovereignty lands to the city, since other classes of public lands *belong* to the State. See Kimball v. MacPherson, 46 Cal. 104; People *ex rel.* Pierce v. Morrill, 26 Cal. 336. The title does not indicate that there are sovereignty lands "lying in the corporate limits of the city of Tampa," and no reference is made in the title to Chapter 4883 defining the city boundaries. If Chapter 4883 furnishes a description of the lands granted by Chapter

4882, it also indicates the purposes for which the granted lands were designed to be used.

Sovereignty lands are not included among the public lands that are subject to ordinary disposition; and ordinarily legislation affecting public lands does not extend to sovereignty lands. See Mann v. Tacoma Land Co., 153 U. S. 273, 14 Sup. Ct. Rep. 820; Broward v. Mabry, 58 Fla. 398, 50 South. Rep. 826; Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. Rep. 548; 32 Cyc. 775; 22 R. C. L. 249. Even if the purported grant to the city "in fee simple absolute" of sovereignty lands is valid as a grant of such lands, it is merely a voluntary transfer of the legal title subject to lawful public rights, and subject to legislative action as to the title and uses of the lands, such transfer being to a subordinate governmental agency that is expressly made subject to legislative control. Sec. 8, Art. 8, Const.; McQuillan's Munic. Corp. §398; 1 Dillon on Munic. Corp. (5th ed.) §265. No question of vested rights or of supervening equity is involved.

Chapter 4882, Acts of 1899, considered with Chapter 4883, Acts of 1899, which latter statute gives to the city exclusive power and control over the construction, etc., of all public wharves, landings, bridges, canals, streams, dock lines, etc., shows a legislative intent that the purported grant of sovereignty lands to the city was for authorized municipal purposes; and this intent is further shown by Section 5, Chapter 6482, Acts of 1911, by the definite provisions of Chapter 6781, Acts of 1913, and by subsequent statutes. This comports with the provisions of Chapter 3164, Acts of 1879, now Sections 1849 et seq. Revised General Statutes, 1920, and other statutes affecting the powers of the city. Even if the State may grant to a municipality for other than public purposes the title to tide lands and lands under navigable waters, such grant does not impair

the rights of the public in the use of the waters and lands as authorized by law; and the grant in Chapter 4882, if valid, does not provide or contemplate that the city may convey the tide and submerged lands in which the whole people of the State have an interest, to an individual for the purpose of private development and sale as a residential subdivision. See City of Oakland v. Oakland Water Front Co., 118 Cal. 160, 50 Pac. Rep. 277; 3 McQuillin on Munic. Corp. §1141. Chap. 4882 does not in view of the nature and tenure of the lands granted, by implication authorize the contemplated conveyance by the city.

The purported statutory grant of sovereignty lands· "in fee simple absolute" to the city of Tampa by Chapter 4882, Acts of 1899, and authority given the city by other statutes to "purchase and hold real estate, personal and mixed property, and to dispose of the same for benefit of said city," and "to sell any real estate committed to its charge." considered in view of the public rights in the premises, and of other statutory provisions affecting the matter, do not authorize the city to grant such sovereignty lands to an individual for the purpose of making the area a subdivision of the city as a private enterprise.

Chapter 6781, Acts of 1913, if not also Chapter 7304, Acts of 1917, Chap. 6782, Acts of 1913, Chapter 7247, Acts of 1915, and the Charter Acts of the City of Tampa, have in effect modified the provisions of Chapter 4882, Acts of 1899. the city being a subordinate governmental entity wholly within the control of the legislature. See Sec. 8, Art. 8, Const. Chapter 6781, Acts of 1913, under a title covering submerged lands in Hillsborough River and Bay, grants to the city the submerged lands covered by Chapter 4883, Acts of 1899, and other like lands for specified public purposes, and Chapter 6781 clearly does not authorize the city to make the proposed contract or conveyance.

See Chapter 6782, Acts of 1913, which supplements the provisions of Chapter 6781 as to the uses and purposes of the lands. Chapter 7247, Acts of 1915, sections 1849 *et seq*. Rev. Gen. Stats. 1920, or other statutes referred to by the appellees, obviously do not authorize the city to make the present contract to convey sovereignty lands to an individual for private purposes.

The grant of sovereignty lands to the city in Chapter 4882, if valid, was not irrevocable, but was subject to revocation or modification by statute, the grant being to a city as a mere governmental agency whose powers and authority are subject to legislative action; and the title of Chapter 6781, Acts of 1913, gave notice that the grant to the city in that Act was of "submerged lands or middle ground in the Hillsborough River and in the Hillsborough Bay and Sparkman Bay for the purpose of navigation, commerce and municipal docks and terminals," etc., "within and contiguous to its present corporate limits", etc.  This title considered in its entirety as expressing a qualified grant to a city, was sufficient to put the public upon enquiry as to whether the lands covered by the qualified grant contained in Chapter 6781 did not include the lands referred to in Chapter 4882, Acts of 1899, so as to modify the previous grant of them, which latter embrace "all lands owned or held by the State of Florida, in trust or otherwise, and lying and being within the corporate limits of said city of Tampa, whether said lands are covered by the tide or other waters, and including all sawgrass and marsh lands, as well as the bottom of Hillsborough Bay and Hillsborough River."  As the title of the city, a mere governmental agency, to the sovereignty lands purported to have been granted by Chapter 4882, could be recalled or modified by a subsequent statute, no rights of third persons intervening, the title of Chapter 6781, Acts

of 1913, was amply sufficient to give notice that the Act of 1913 was designed to define or qualify the authority of the city with reference to all tide and submerged lands over which the city had any authority. Therefore the contention that the title to Chapter 6781 did not warrant provisions in the Act modifying the tenure and uses of the lands covered by the grant in Chapter 4882, Acts of 1899, is clearly untenable.  See Chapter 6782, Acts of 1913.  The contract in this case relative to the sovereignty lands sought to be granted by the city, was made in 1924, eleven years after the passage of Chapter 6781, Acts of 1913, designating the purposes for which such lands are held by the city.

Chapter 7304, Acts of 1917, conveys title to certain lands in tidal waters to the Trustees of the Internal Improvement Fund, a public agency, for sale for the benefit of the State, with express limitations designed to conserve the public rights.

The riparian Acts of 1856 and 1921 are not considered because obviously they do not authoribe the conveyance sought to be enjoined in this case and the lands are apparently not all within the purview of the riparian Acts. See Merrill-Stevens Co. v. Durkee, 62 Fla. 549, 57 South. Rep. 428.  Sec. 9, Chap. 8537, the riparian Act of 1921, expressly excepts previous grants of certain sovereignty lands to a State agency from the operation of the riparian Act. The city does not appear to own contiguous uplands so as to be a "riparian proprietor" under Chapter 8537.

The proposed conveyance by the city of tide and submerged lands is not for an appropriate public or quasi-public purpose.  Nor are there appropriate and reasonable provisions for access of the public to the navigable waters from the lands sought to be conveyed for reclamation and residential purposes as a subdivision of the city.

The net result of the principles of law adduced from con-

trolling authorities appears to be that the title to tide lands and lands under navigable waters of the State including the shore to ordinary high water mark is in the State by virtue of its sovereignty; that such title or rights thereunder may be granted or conveyed to private ownership subject to such public uses of the navigable waters and the lands as may be allowed by law; that grants or conveyances of such lands or rights therein should be interpreted with refernce to lawful public uses of the navigable waters and of the lands when their use is lawfully incident to public rights in the waters; that the rights of the State and of private owners in such lands and waters are always subject to the paramount authority of Congress over the navigable waters for purposes of navigation and interstate and foreign commerce; that grants of such sovereignty lands to a municipality are in view of their nature and uses, ordinarily for appropriate public purposes; that a municipality is a governmental agency whose powers and authority are limited and are subject to legislative control; that grants of sovereignty lands by a city to an individual for private purposes should be clearly and indubitably authorized by a duly enacted statute; and that no valid and undoubted statutory authority is shown for a grant or conveyance in fee simple by the city of Tampa to an individual of tide lands and portions of the lands under a navigable Bay and River adjacent to the seaport city, the lands to be filled in to the main navigable waters and the area used on which to build a subdivision of the city as a private enterprise.

No statute is adduced authorizing the city to make a contract like the one here involved, affecting the title to and permanent use of tide and submerged lands in which the whole people of the State have an interest, therefore

an injunction by the court below at the suit of the State seems to be appropriate.

The opinion of the court appears to be predicated upon the grants of sovereignty lands contained in Chapters 4882 and 8537, Laws of Florida, without considering (1) that the purported grant of sovereignty lands to the city by Chapter 4882, Acts of 1899, was to a subordinate governmental agency and was, if valid, subject to public rights in the premises and to legislative revocation or modification, and that the purported grant to the city was modified by subsequent statutes, no right of private parties intervening; or (2) that Section 9 of the riparian act of 1921, Chapter 8537, expressly excepts from the operation of the statute certain classes of sovereignty lands that the pleadings in this case show are included in the grant which the city, without statutory authority, seeks to make to an individual for private purposes.

## On Petition for Rehearing.

TERRELL, J.—Petition for rehearing on part of the State sets up that in the opinion and decision filed herein the court did not "consider or pass upon and decide" "certain questions of law involved in and raised in said cause." That is to say, the court overlooked Section 9 of Chapter 8537, Acts of 1921, sometimes designated as the Riparian Rights Act, which outlines the policy of the State with reference to certain rights of water front owners and expressly excepts from the operation of its terms Sections 1056, 1057, 1058, 1059, 1060, 1061, 1062, 1063 and 1064, Revised General Statutes of Florida.

In so far as the main opinion is influenced by questions of policy it is based on Chapter 8537, Acts of 1921, yet these excepted provisions from said Act were for the pur-

S—Vol. 88.

pose of reserving to the State the classes of lands therein described, and from the record seem to me to cover a portion of the lands involved in the contract here attacked.

Petition for rehearing further states that the court overlooked the following proposition:

"(1)    That the city not being a riparian owner, the riparian act is not applicable and does not authorize the contemplated grant.

"(2) . That the grant of sovereignty lands to the city, if valid, was to a subordinate governmental entity, not to private ownership, and the grant was subject to modification or revocation by subsequent statutes.

"(3)    That the grant was in fact and in law modified, if not revoked, by subsequent valid statutes in that all of the granted lands were in such subsequent valid statutes required to be used for designated public or quasi public purposes, no rights of third persons intervening.

"(4)    That the city has been given no express power to make the contract or contemplated grant and no implied power results from the grant, particularly, in view of the subsequent statutes designating the purposes for which the granted lands are to be used, even if such designated purposes were not implied from the tenure, nature and legal uses of the sovereignty lands granted to a city and not to private parties.

"(5)    That the city can exercise only such powers as are given by statute, and the statutes do not expressly or by implication give the city power to make the contract or grant to a private party for private uses covering hundreds of acres of tide lands, and lands under navigable waters, that are immediately useful, if not actually necessary for navigation and other public uses of the waters of a navigable bay and river in front of a seaport city of the State.

"(6)   That the averments of the answer are insufficient to overcome the operation of the law upon facts alleged in the bill of complaint, or facts of which the court takes judicial notice."

It is clear that the Riparian Act of 1921 confers no rights in the premises upon the City of Tampa and none are claimed by it.   That Act cannot therefore be said to authorize the conveyance of the sovereignty lands sought to be enjoined.   It is also clear that Chapter 4882, Acts of 1899, was modified by Chapter 6781, Acts of 1913, Chapter 3304, Acts of 1917, Chapter 8537, Acts of 1921, and other statutes.   If Chapter 4882, Acts of 1899 was a valid act, the grant of sovereignty lands contained therein being to a governmental agency was subject to revocation or modification at any time prior to vestiture of rights on the part of third parties.   Illinois v. Illinois Cent. R. Co., 146 U. S. 387, 13 Sup. Ct. Rep. 110.

If Chapter 4882, Acts of 1899, is a valid conveyance it includes the sovereignty lands covered by the contract. Such statute does not expressly authorize the contemplated conveyance by the city of sovereignty lands, and certainly no authority to make the conveyance arises by implication when the limited powers of the city and the nature and tenure of the sovereignty lands are duly considered.   Subsequent statutes not only do not confer upon the city the power to convey the sovereignty lands, but their provisions clearly exclude the exercise of such a power by the city. Therefore the city has no authority to convey sovereignty lands   If the appellee has the right to use the lands under the riparian or other acts because he owns the islands referred to in the contract, that does not authorize the city to make the conveyance of sovereignty lands, whether the appellee needs the conveyance or not.

WHITFIELD, J., concurs.